SEDGWICK R. RUTAN

v.

HANNAH CRAWFORD.

1. A parol letting under which the tenant enters into possession and makes improvements will be enforced, in case the terms are definite, fair and reasonable, and no advantage taken by either party of the other.

2. But if there be uncertainty as to what the understanding was as to the nature or extent of the tenancy, or as to the consideration to be rendered by the tenant, the court will not interfere in behalf of either party to enforce such alleged letting.

3. The court will always uphold family arrangements when understandingly entered into; and will do so, even though the consideration to be rendered be in the nature of personal services or their equivalent; but the nature and extent of those must have been clearly and fully agreed upon by the parties, so that nothing be left to conjecture or to be supplied by the court.

4. In such case, if the tenant go into possession and make valuable permanent improvements, she will be allowed their present value during the lifetime of the tenant of the particular estate.

---

On bill for injunction, and for specific performance.

*Mr. A. W. Slockbower* and *Mr. L. Van Blarcom*, for the complainant.

*Messrs. Martin & Conklin*, for the defendant.

BIRD, V. C.

On June 16th, 1858, Rutan married Esther, the daughter of Hannah Crawford, the defendant. Hannah was then a widow,

and was in the enjoyment of the lands named in the bill, which had been devised to her by the will of her father for and during her life, and, at her decease, to her heirs-at-law. Esther was then her only child, and she has remained a widow ever since, being now in her eightieth year.

Rutan alleges that about the 1st day of July, as he was married in June, he and Hannah entered into an agreement by which he " was to board and clothe and provide medical attendance when sick for the said Hannah Crawford as long as she lived, free of charge, and in consideration thereof he should have the sole use and profit of said farm and tract of land during the natural life of the said Hannah Crawford, and should make such additions thereto and thereon, in the erection and construction of buildings, the putting up and keeping up the fences and clearing up and improving the land, as in his judgment was needed and profitable."

It is admitted that there was an agreement made respecting this land between them, but it is denied that it was for or during the lifetime of Hannah. Hannah says that the agreement was that Rutan was to take the farm and farm it for the produce, and that she was to have a living, and insists that nothing was said about the length of time that such agreement was to run.

But whatever the agreement was, Rutan immediately took possession of the land under it, and has remained in possession ever since. During this time he has made additions to the house and paid a part of the expense of a new roof for it, has made additions to the barn, has built a new wagon-house, and, with some old materials and some new, built a second wagon-house, and has made other small additions in the way of buildings, has cleared about six acres of new ground, and has laid about one hundred and ninety yards of stone fence.

Esther gave birth to three children, all of whom are living and of age. She continued to live with her husband until September, 1887, when she left him and went to reside with one of her married children. The cause of her leaving was regarded as no part of the issue at the hearing between the parties, and therefore no reason is assigned for the separation. Hannah re-

Rutan v. Crawford.

mained in the homestead about a month longer, when she left also, and soon thereafter commenced an action of ejectment against Rutan for the recovery of the possession of the premises. This bill is filed to enjoin that action, and also to compel the specific performance of the alleged contract. The contract was not reduced to writing; but having entered into possession under it, and having made valuable improvements of a permanent nature, the first section of our statute of frauds concerning leases (*Rev. p. 444*) (*a*) cannot be a hindrance to specific performance by this court, provided such an agreement has been set up and proved as can, according to the practice of the court, be enforced. *Kine* v. *Balfe, 2 Ball & B. 347; Wilson* v. *West Hatlepool Railway, 11 Jur.* (*N. S.*) *124, 34 L. J. Ch. 241; Listher* v. *Foxcroft, Coll. Parl. Cas. 108, Gilb. 411; Gregory* v. *Mighell, 18 Ves. 328.* The agreement set out in this bill I have given above. It will be seen that this was Rutan's version of it when he was preparing his case. It appears in the bill that he was to provide Hannah board, clothes and medical attendance free of charge during her natural life, and that he was to make such erections of buildings, and to so repair the fences and to improve the land as in his judgment would be profitable. In his testimony, he says Hannah asked him to take the farm and to run it, as she was tired of trying to run it; when he asked her upon what terms, and she said that if he would take it and run it, she would give him all that he could make over and above a living, she to live with him during her lifetime. It will be seen that there is no mention of board or clothes or medical attendance, nor is there anything said about making

---

(*a*) That all leases, estates, interests of freehold or term of years, or any uncertain interests of, in, to or out of any messuages, lands, tenements or hereditaments, made or created, or hereafter to be made or created, by livery and seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, or their agents thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making any such parol leases or estates notwithstanding; except, nevertheless, all leases not exceeding the term of three years from the making thereof.

additions thereto or thereon, in the way of new buildings or otherwise.

Hence the inquiry, What was the agreement? Was it that set up in the bill, or that sworn to in open court? It may be that we could, to some extent, determine what the parties meant by Hannah having a living there; that point might be ascertained by the way she had been living there, or by the way that she was contented to live after the agreement. So, in one way or another, they, by their conduct, might enable the court to settle, with reasonable distinctness, what their understanding was on this head, until some new emergency should arise. In this regard, I speak without reference to particulars to which I will call attention hereafter. But what of medical attendance? Was she entitled to that, or was she not? In his bill, Rutan says she was to have it. If that was part of the agreement, it was an important part, and certainly was not included in the term "living." But, in this connection, the important fact is, in the evidence given us in the testimony of Rutan as well in his bill, the very great uncertainty as to what the parties did in truth agree to. This is made to appear still stronger when it is remembered that in his bill he says that he was to make certain additions to the buildings, such as he should think beneficial, while in his testimony as a witness, in answer to the question as to what the contract was, he said nothing about buildings or additions. And on these two heads alone, *i. e.*, the absence, in his testimony, of anything respecting "medical attendance" or "improvements," do not such difficulties arise as to make it quite impracticable for the court to aid the complainant? But what is the extent of his rights? In making a decree, what limit could the court make to his control of the farm? He could well say, "I am under no obligations as to the manner of the management."

But suppose that these difficulties could be overcome by regarding the phrase "living" as broad enough to comprehend every sort of comfort that Hannah might be reasonably entitled to, when in sickness as in health, and that the reference to the additions and new buildings was intended to be left entirely to the option of Rutan, in one most material branch of the contract set

up in the bill Rutan is contradicted both by Hannah and his wife. He swears that the agreement by which he entered into the possession and made these improvements was to extend over the entire period of Hannah's lifetime; while they both swear that it was wholly indefinite as to time, and that nothing at all was said as to the length of time it was to run. And it is very proper to remark, in passing, that Rutan swears that he had the interview with Hannah, on which he rests the alleged agreement, when he was milking, in the barnyard; while both Hannah and the wife swear that the conversation respecting the management of the farm was in the house. This clearly shows the very great uncertainty which the court has to deal with in this case. As above intimated, Hannah said that she expected the arrangement would continue all of her lifetime; but she swears, very positively, that no time was named in the agreement; and her daughter is equally emphatic. It is true that respectable witnesses swear that Hannah told them that Rutan had the farm as long as she should live; but it is. also true that Rutan's wife swears that he often said to her that her mother could turn him out at any time, but that she did not know enough to do it.

It is the plain duty of these parties to live together as one family. It is also the plain duty of the court to compel the specific performance of the agreement made so long ago, in the days of comparative youth and prosperity. This consideration is deeply impressed upon me, for, from the evidence, I am persuaded that the differences between Rutan and Hannah are not serious, and that they could inhabit the same dwelling in comfort and peace. But all contracts which the courts undertake to enforce are supposed to be not only certain and definite, but also, to a reasonable degree at least, mutual. This latter element will never be overlooked when one of the parties is an intelligent business-man and the other a very plain and inexperienced woman, and more especially so when that man is the son-in-law, and the husband of the other's only child. In addition to these, such contracts must present a fair consideration, certain and well-defined by the parties at the time of making them, not to be defined by the court.

Above all should the above consideration prevail, in a contract of this nature, not only involving the management of the farm for the life-tenant, during her life, but also personal services to that life-tenant during her lifetime. Now, to lay aside the obligations which the court must define and impose on the tenant, supposing that they could be ascertained and settled by the custom of the neighborhood, how shall the court define and settle the obligations of such tenant to the owner of the life-estate? What is the scope and extent of the phrase, "She to live in my family," or, "She wanted me to keep her?" It will be at once perceived that the phrases involve, to some extent, personal service or attention on the part of Rutan towards his mother-in-law. She is not to be fed as a brute, nor to be sheltered as a horse simply. She is entitled to decent physical comfort, and these, it will be admitted, are implied in every such contract. But at this point my difficulties arise. Who shall say, in this case, what those physical comforts are, or shall be from time to time as the life-tenant grows older and feebler? Who can determine what personal service or attention the mother-in-law is entitled to? That which might be abundantly reasonable at this time might prove wholly inadequate to-morrow or next year. This case has developed facts which stand as a hindrance to the execution of this contract, or rather which show that there was no such contract as the court can make a satisfactory decree upon. For example, a dispute arose between them as to the kind of meat, or quantity of it, which Hannah was entitled to on one occasion when she was not very well; and on another occasion there was a misunderstanding as to the amount of money she was entitled to for her clothing. To these may be added the fact that the room which she had occupied for a long time as a bed-room, on the first floor, was, in her absence, made into a hall, and so fitted up that it could not be used as a bed-room, and Hannah was sent to the story above to sleep, to her discomfort and dissatisfaction.

I think a very little reflection on these considerations will lead the unprejudiced mind to the conclusion that a decree cannot be made in such case without adding to the contract new terms, and

Rutan v. Crawford.

such as the parties never for a moment considered. In my judgment, therefore, however strong the desire of the court may be to carry out every such family arrangement, it cannot be done unless the arrangement submitted for the court to enforce be reasonable, certain and without undue advantage on either hand or unfair subjection for the weaker party.

Besides the buildings and fences, Rutan has planted a very large number of fruit trees on the premises, many of which are in fine bearing condition. Many of these he has planted quite recently. I believe that he claims that he did this solely on the ground of his interest in the life estate of Hannah. I cannot, under the circumstances of the case, accept this view as an entirety. In looking at this branch of the case, I cannot close my eyes to the fact that Rutan was and is the husband of the owner of the fee, by whom he had three children, who are still living, nor to the additional fact that, when he says many of these outlays were made, it was not very reasonable to suppose that Hannah would survive their usefulness. These thoughts beget the most decided impression on my mind that Rutan was to a very great extent influenced by a tender and highly commendable regard for the future welfare of his own offspring, if not of his wife.

But to avoid doing Rutan the least injustice in this respect, I will advise that he be paid the present value of these improvements, during the lifetime of Hannah, according to the rules established in cases of dower, and by the table in use for that purpose.

The injunction will be dissolved, with costs, but the bill will be retained for the purpose of the accounting to the extent indicated, and as to that each party will go without costs.